IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00824–EWN–MJW

ED THOMAS,

     Plaintiff,

v.

PILLOW KINGDOM, INC., d/b/a
FURNITURE ROW, LLC,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is an employment discrimination case. Plaintiff Ed Thomas alleges that Defendant

Pillow Kingdom, Inc., retaliated against him for protesting the discriminatory treatment of other

employees in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). This matter is before the court on

"Defendant's Motion for Summary Judgment," filed January 4, 2008. Jurisdiction is proper

pursuant to 28 U.S.C. § 1331.

## FACTS

*1.*     ***Factual Background***

     *a.*     ***Defendant's Business, Plaintiff's Position, Plaintiff's Relationship with His Supervisors and Co-Workers***

Defendant is a Colorado corporation and part of the Colorado-based Furniture Row Group which owns and operates furniture stores in approximately thirty states.  (Br. in Supp. of Def.'s Mot. for Summ. J. [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶¶ 1–2 [filed Jan. 4, 2008]; *admitted at* Pl.'s Resp. to Def.'s Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Resp. to Def.'s Statement of "Undisputed" Facts [hereinafter "RSOF"] ¶¶ 1–2 [filed Feb. 25, 2008].)  Defendant manages the distribution of furniture sold by two of the Furniture Row Group's retail brands from a warehouse and distribution center in Denver, Colorado.  (*Id.*, SOF ¶ 3; *admitted at* Pl.'s Resp., RSOF ¶ 3.)

From 1999 to 2006, Plaintiff was employed by Defendant at its distribution center as a handyman and either "maintenance supervisor" or "project manager."  (*Id.*, SOF ¶ 4, *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 4.)  Plaintiff was a "jack-of-all trades" responsible for general maintenance of the distribution center and related buildings.  (*Id.*, SOF ¶ 5; *admitted at* Pl.'s Resp., RSOF ¶ 5.)

William Smith is Defendant's operations manager, responsible for managing its distribution center and some of its manufacturing operations.  (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp., RSOF ¶ 6.)  Rick Brockman, who reports to Mr. Smith, manages Defendant's distribution center, and was promoted to his position "several years ago."  (*Id.*, SOF ¶  8; *admitted at* Pl.'s Resp., RSOF ¶ 8.)  Both Messrs. Smith and Brockman were Plaintiff's supervisors.  (*Id.*, SOF ¶¶ 7–8; *admitted at* Pl.'s Resp., RSOF ¶¶ 7–8.)

Keith Filippazzo was Plaintiff's closest friend at work.  (*Id.*, SOF ¶ 44; *admitted at* Pl.'s Resp., RSOF ¶ 44.)  Mr. Filippazzo supervised between twenty and seventy people — mostly of

Hispanic origin — who assembled chairs for Defendant.  (*Id.*, SOF ¶ 45; *admitted at* Pl.'s Resp.,

RSOF ¶ 45.)  Like Plaintiff, Mr. Filippazzo originally reported to Mr. Smith, but subsequently

reported to Mr. Brockman as well upon Mr. Brockman's promotion.  (*Id.*, SOF ¶ 48; *admitted at*

Pl.'s Resp., RSOF ¶ 48.)

### i.      *Plaintiff's Relationship with Mr. Smith*

Shortly after he began working for Defendant, Plaintiff felt "left out" when Mr. Smith

did not invite him to a management retreat.  (*Id.*, SOF ¶ 13; *admitted at* Pl.'s Resp., RSOF ¶ 13.)

Plaintiff also reports having felt "stunned" to hear Mr. Smith use profanity in his office because

Mr. Smith was a religious man and a former police officer.  (*See* Pl.'s Resp., Ex. 2 at 10, 38

[Thomas Dep.].)  Plaintiff reports that Mr. Smith "got in [his] face" and became "verbally

abusive" with him on several occasions, but acknowledged that Mr. Smith had "slowed down

saying things and using him as his . . . punching bag" after he confronted Mr. Smith on one

occasion.  (*Id.*, Ex. 2 at 38 [Thomas Dep.].)

### ii.      *Plaintiff's Relationship with Mr. Brockman*

Mr. Brockman, a former forklift driver at Defendant's distribution center who was

younger than Plaintiff, was promoted by Mr. Smith to manage Defendant's distribution center

following several other promotions and a year spent managing another of Defendant's

warehouses.  (Def.'s Br., SOF ¶¶ 24–26; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶

24–26.)  Plaintiff testified that, sometime in 2003 or 2004, he met with Mr. Smith regarding his

own desire for promotion, but had been told that he would have to quit his maintenance position

with Defendant, apply for a position in a retail store, and advance through that channel.  (Pl.'s

Resp., Ex. 1 at 15 [Thomas Dep.].)  Plaintiff reports having felt "stunned" by this news because "[Mr.] Brockman didn't have to quit and was moved into a higher position."  (*Id.*)

Plaintiff believed that Mr. Brockman was less experienced than him, was unintelligent, used inappropriately informal language, and worked without a shirt on occasion.  (Def.'s Br., SOF ¶ 28; *admitted at* Pl.'s Resp., RSOF ¶ 28.)  Despite such criticisms, Plaintiff also acknowledged that he did not know: (1) how many people Mr. Brockman had supervised at the other warehouse before being promoted to manage the distribution center; (2) whether Mr. Brockman had been successful managing the other warehouse; or (3) the type of training, guidance, or mentoring in management Mr. Brockman may have received prior to his promotion. (*Id.*, Ex. 3 at 16 [Thomas Dep.].)  Plaintiff testified that Mr. Smith had told him that Mr. Brockman was "a hell of a shipper."  (*Id.*)

### iii.    *Plaintiff's Relationship with Mr. Filippazzo*

Plaintiff and Mr. Filippazzo socialized and took vacations together, including trips to out-of-state motorcycle rallies.  (*Id.*, SOF ¶ 43; *admitted at* Pl.'s Resp., RSOF ¶ 43.)  Mr. Filippazzo had wanted the promotion that Mr. Brockman received.  (*Id.*, SOF ¶ 50; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 50.)  Moreover, Mr. Filippazzo said he considered Mr. Smith a "constant threat to him."  (*Id.*, SOF ¶ 51; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 51.)

With respect to Messrs. Smith and Brockman, Mr. Filippazzo stated in his deposition that: (1) Mr. Smith's job was a "figure head position;" (2) Mr. Smith had promoted Mr. Brockman even he though had "no experience of [sic] management;" (3) Mr. Smith did not

promote Mr. Filippazzo because he was not a "yes man;" (4) Mr. Brockman allegedly blew "spitballs" at him during a manager's meeting; and (5) Messrs. Smith and Brockman, along with other managers, constituted a "little gestapo[]." (*Id.*, SOF ¶ 49; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 49.)

### b. Events Precipitating the July 24, 2006, Meeting

During the week of July 17, 2006, Mr. Filippazzo was investigated by Defendant's legal department for allegedly making inappropriate statements about Defendant's Hispanic employees. (*Id.*, SOF ¶ 52; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 52.) Mr. Filippazzo believes that this investigation was initiated after a Hispanic employee went to Mr. Smith to complain about allegedly inappropriate statements, and Messrs. Smith and Brockman encouraged this employee to pursue his complaint through Defendant's legal department. (*Id.*, SOF ¶ 55; *admitted at* Pl.'s Resp., RSOF ¶ 55.)

During an ensuing investigation, Mr. Filippazzo was interviewed by John Incampo, an investigator and former police officer who works in Defendant's legal department. (*Id.*, SOF ¶ 58; *admitted at* Pl.'s Resp., RSOF ¶ 58.) According to Mr. Filippazzo, this interview lasted ten hours. (*Id.*, SOF ¶ 59; *admitted at* Pl.'s Resp., RSOF ¶ 59.) Mr. Filippazzo testified that he "walked out" on the interview after purportedly telling Mr. Incampo, "I'm not listening to any more of your garbage." (Pl.'s Resp., Ex. 4 at 5 [Filippazzo Dep.].) Mr. Filippazzo also testified that Messrs. Incampo and Smith suggested that he should apologize to the people he managed, and that he subsequently called a meeting of the chair factory workers in which he apologized for any inappropriate comments he may have made. (Def.'s Br., SOF ¶¶ 62–63; *admitted at* Pl.'s

Resp., RSOF ¶¶ 62–63.) Mr. Filippazzo claimed that he was humiliated by this apology and believed it had compromised his authority as a manager. (*Id.*, SOF ¶ 64; *admitted at* Pl.'s Resp., RSOF ¶ 64.)

Plaintiff was on vacation while Mr. Filippazzo was being investigated, but learned of the investigation after returning to work on July 24, 2006. (*Id.*, SOF ¶¶ 65–66; *admitted at* Pl.'s Resp., RSOF ¶¶ 65–66.) Mr. Filippazzo told Plaintiff that he had been reprimanded for "saying things like the word 'Hispanic,'" and had been humiliated by his perceived forced apology. (*Id.*, SOF ¶ 67; *admitted at* Pl.'s Resp., RSOF ¶ 67.) Plaintiff believed Mr. Filippazzo's version of what had transpired during the investigation, and testified to having felt "appalled" because he felt that Defendant's legal department "needed to look into other things that were going on in the company." (*Id.*, Ex. 4 at 5 [Thomas Dep.], Ex. 3 at 19 [Thomas Dep.].)

Plaintiff agreed to go with Mr. Filippazzo to protest the investigation to Mr. Ruegsegger. (*Id.*, SOF ¶¶ 70–71; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 70–71.) As to their intent in arranging this meeting, Plaintiff and Mr. Filippazzo testified that they intended to apprise Mr. Ruegsegger of what they believed was an unfair application of Defendant's policies, including its antidiscrimination policy. (*Id.*, SOF ¶ 72; *admitted at* Pl.'s Resp., RSOF ¶ 72.) Defendant's antidiscrimination policy requires, *inter alia*, that employees who are aware of illegal discrimination report such discrimination to Defendant's legal department immediately. (*Id.*, SOF ¶ 9; *admitted at* Pl.'s Resp., RSOF ¶ 9.) Plaintiff testified that he "[did not] know" whether he had thought about complaining about discrimination prior to his conversation with Mr. Ruegsegger, but acknowledged that he had had "no intention whatsoever of making a complaint"

when he came into work that morning. (*Id.*, Ex. 4 at 13 [Thomas Dep.].) Plaintiff also testified

that he had not reported Defendant's alleged acts of discrimination earlier for fear of retaliation,

(Pl.'s Resp., Ex. 2 at 13–14 [Thomas Dep.]), but acknowledged that he was unaware of any

previous instances of retaliation against any employee who had reported discrimination, (Def.'s

Br., SOF ¶ 12; *admitted at* Pl.'s Resp., RSOF ¶ 12).

### c. Plaintiff's July 24, 2006, Meeting with Mr. Ruegsegger[1]

During Plaintiff and Mr. Filippazzo's meeting with Mr. Ruegsegger, Mr. Filippazzo told

Mr. Ruegsegger that he had been humiliated and that he did not respect Messrs. Smith and

Brockman. (*Id.*, SOF ¶ 76; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 76.) Both Plaintiff

and Mr. Filippazzo told Mr. Ruegsegger that it was unfair that Mr. Filippazzo had been

investigated when Messrs. Smith and Brockman and others had engaged in misconduct that was

at least as serious as that Mr. Filippazzo had been accused of, but had not been investigated or

reprimanded. (*Id.*, SOF ¶ 77; *admitted at* Pl.'s Resp., RSOF ¶ 77.) Plaintiff and Mr. Filippazzo

claim they presented a long list of grievances to Mr. Ruegsegger regarding alleged misconduct

and inappropriate behavior by various managers and employees at Defendant which neither party

---

[1]The following account of Plaintiff's July 24, 2006, meeting with Mr. Ruegsegger is premised upon facts which Defendant accepts as true for the purpose of this motion only, but which it intends to contest if this case goes to trial. (*See* Def.'s Br. at 3 n.1, 18 n.5) Defendant's true theory regarding what happened at this meeting is that: "[Plaintiff and Mr. Filippazzo] came into the meeting, told [Mr. Ruegsegger] that they were quitting, and asked if Defendant would give them severance . . . . It was only after they had stated they were quitting . . . and in response to Mr. Ruegsegger's questions, that [Plaintiff and Mr. Filippazzo] complained about [Messrs.] Smith and Brockman." (*Id.* at 18 n.5.)

contends constituted illegal discrimination.[2]  (*See id.*, SOF ¶ 78; *admitted in relevant part at* Pl.'s

Resp., RSOF ¶ 78.)  Moreover, Plaintiff and Mr. Filippazzo claim they outlined multiple

grievances which Plaintiff claims arguably *do* constitute illegal discrimination.  (*See id.*, SOF ¶

79; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 79.)  These grievances, as augmented by

subsequent deposition testimony probative of their truth, were as follows:

(1)    Mr. Smith talked to Plaintiff about his church "numerous times" and
       encouraged him to attend on at least several occasions, and told Plaintiff
       that "there's a place in the Bible for people like you who don't believe."
       (*Id.*, Ex. 4 at 7–8 [Thomas Dep.].)  Plaintiff acknowledged that Mr. Smith
       stopped talking to him about his church after accepting that he was
       uninterested.  (*Id.*, Ex. 4 at 9 [Thomas Dep.].)

(2)    Mr. Brockman, who began attending Mr. Smith's church, was promoted to
       manage Defendant's distribution center.  (*Id.*, SOF ¶ 79[b]; *admitted in
       relevant part at* Pl.'s Resp., RSOF ¶ 79[b].)  Plaintiff believed that Mr.
       Brockman was not promoted "simply because of his knowledge or his
       skill."  (*Id.*, Ex. 4 at 9 [Thomas Dep.].)

(3)    Mr. Smith asked Plaintiff to do unpaid handyman work for his church —
       including installing a handrail on the  alter — and Plaintiff complied on at
       least one occasion, out of an apparent sense of compulsion.  (*See id.*, Ex. 4
       at 8 [Thomas Dep.].)  On another occasion, Plaintiff declined to remove a
       chainlink fence from church property after Mr. Smith told Plaintiff he
       could keep the fence if he removed it.  (*See id.*)

(4)    Mr. Smith spoke about how a female employee was much calmer now that
       she was "getting some;" referred to women in the office as "PMSing;" and

_____

[2]For instance, Plaintiff and Mr. Filippazzo allegedly complained, *inter alia*, that: (1) Mr.
Brockman and another manager had called certain employees "pussies;" (2) Defendant's
management made unsafe modifications to warehouse forklifts; (3) Mr. Smith had threatened to
"cut [Plaintiff's] legs off" if he revealed something discussed in a managers' meeting; (4) Mr.
Smith had called a fellow employee a "fat pig;" and (6) a coworker had assaulted Plaintiff, but
Defendant had done nothing about it after Plaintiff complained.  (*See* Def.'s Br., SOF ¶ 78;
*admitted in relevant part at* Pl.'s Resp., RSOF ¶ 78.)

rhetorically asked about a female employee, "How would you like to wake up next to that bitch every morning?"  (*Id.*, SOF ¶ 79[d]–[f]; *admitted at* Pl.'s Resp., RSOF ¶ 79[d]–[f].)

(5)     Mr. Smith joked offensively about the sexual orientation of a gay buyer at the distribution center.  (*Id.*, SOF ¶ 79[g]; *admitted at* Pl.'s Resp., RSOF ¶ 79[g].)

(6)     Mr. Smith once told Mr. Filippazzo to "get his Mexicans to go out and clean up the lot, pick up trash, mow, [and] do things like that."  (*Id.*, Ex. 4 at 15 [Thomas Dep.].)  Plaintiff acknowledged that there was nothing wrong with a manager using his lowest-paid employees to do unskilled work, but took issue with Mr. Smith's reference to Mr. Filippazzo's workers as "[h]is Mexicans."  (*Id.*, Ex. 4 at 16–17 [Thomas Dep.].) Plaintiff acknowledged the possibility that all these workers may have been from Mexico.  (*Id.*, Ex. 4 at 15 [Thomas Dep.].)  Plaintiff further testified to having been told by one of Mr. Filippazzo's Hispanic employees that such employees "had to go clean up after the white guy [sic], that [Mr. Smith] wouldn't make the white guy do it, even though he had warehouse employees over there that were low pay in scale, too." (*Id.*, Ex. 4 at 17 [Thomas Dep.].)  Plaintiff testified that there were "very few" Hispanic employees in Defendant's warehouse.  (*Id.*)

(7)     Plaintiff perceived a pay differential between Defendant's Hispanic and white workers.  (*Id.*, SOF ¶ 79[j]; *admitted at* Pl.'s Resp., RSOF ¶ 79[j].) Plaintiff admits that this perceived differential related to the fact that Hispanic workers had been assigned to unload trucks, but had been paid their usual wage as chair factory workers, and not the higher wage paid to people specifically employed to do such labor.  (*Id.*, SOF ¶ 79[j][i]; *admitted at* Pl.'s Resp., RSOF ¶ 79[j][i].)  Plaintiff acknowledged that Mr. Smith put a stop to this practice after learning about it.  (*Id.*, SOF ¶ 79[j][ii]; *admitted at* Pl.'s Resp., RSOF ¶ 79[j][ii].)

(8)     Mr. Brockman referred to Mr. Filippazzo, an Italian-American, as a "Wop."  (*Id.*, SOF ¶ 79[i]; *admitted at* Pl.'s Resp., RSOF ¶ 79[i].)

(9)     Mr. Brockman talked about trying to get rid of an employee with multiple sclerosis and instructed employees to "get something" on the employee so he could be discharged.  (*Id.*, SOF ¶ 79[k]; *admitted at* Pl.'s Resp., RSOF ¶ 79[k].)  Plaintiff testified that he did not know whether this employee

was ever discharged, or whether Mr. Brockman was disciplined for making these alleged statements.  (*Id.*, Ex. 4 at 20–21 [Thomas Dep.].)

Following Plaintiff's and Mr. Filippazzo's presentation of the above allegations, Mr. Ruegsegger told them that he would "get back to them."  (*Id.*, SOF ¶ 84; *admitted at* Pl.'s Resp. ¶ 84.)  Plaintiff and Mr. Filippazzo contend that they left the meeting hoping that Mr. Ruegsegger would initiate an investigation of Messrs. Smith and Brockman similar to one that had been done on Mr. Filippazzo.  (*See id.*, SOF ¶ 85; *admitted at* Pl.'s Resp., SOF ¶ 85.) Despite this hope, Plaintiff and Mr. Filippazzo contend that they were instead discharged the next day.  (*See id.*, SOF ¶ 85; *admitted at* Pl.'s Resp. SOF ¶ 85.)

While the parties ultimately dispute whether Plaintiff and Mr. Filippazzo quit or were terminated,[3] it is undisputed that Mr. Ruegsegger met with them on July 25, 2006, and that he showed them a form separation agreement to be completed.  (Pl.'s Resp., Statement of Additional Disputed Facts [hereinafter "SAF"] ¶ 13; *admitted in relevant part at* Def.'s Reply in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Reply"], Def.'s Resp. to Pl.'s "Additional Undisputed Facts" [hereinafter "RSAF"] ¶ 13 [filed Mar. 12, 2008].)  It is similarly undisputed that Mr. Ruegsegger met with Plaintiff and Mr. Filippazzo on July 26, 2006, and that Mr. Ruegsegger gave Plaintiff a paycheck and a copy of the separation agreement.  (*Id.*, SAF ¶ 14; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 14.)

### d. *Plaintiff's Search for Alternative Employment*

---

[3]*See supra*, note 1.

Plaintiff admitted that he had not received any payroll or contractor checks in thirteen months between his separation from Defendant and his deposition on August 28, 2007. (Def.'s Br., Ex. 3 at 20 [Thomas Dep.].) Instead, Plaintiff testified that he had been trying to start a business selling custom-made metal furniture. (*Id.*, Ex. 3 at 20, 23 [Thomas Dep.].) On the date of his deposition, Plaintiff acknowledged that he was not "looking for any kind of job today other than just pursuing [his] own business," and stated that he had last looked for a job one or two weeks earlier to remain eligible for unemployment benefits. (*Id.*, Ex. 3 at 23 [Thomas Dep.].)

With respect to his income over the past thirteen months, Plaintiff testified that he had borrowed some money from his 401(k); earned between $1,000 and $5,000 from odd work for a contractor; received unemployment benefits; and was "[j]ust starting to see some money coming back from" his business. (*Id.*, Ex. 3 at 20–21, 24–25 [Thomas Dep.].) Plaintiff admits that his business generated less than $1,000 between December 2006 and August 2007. (*Id.*, SOF ¶ 94; *admitted at* Pl.'s Resp., RSOF ¶ 94.)

With respect to his job search, Plaintiff testified that he had used internet sites such as Craigslist.org, looked in newspaper want ads, and contacted employers listed in these ads. (*Id.*, Ex. 3 at 23–24 [Thomas Dep.].) Plaintiff claimed that he sometimes spent more than an hour a day searching for jobs but did not know whether he did so "regularly" because he was "trying to start [his] own business, too." (*Id.*, Ex. 3 at 23 [Thomas Dep.].) Plaintiff acknowledged that he never used temporary agencies to look for work; never used the website Monster.com; and did not buy a newspaper every week, in part because he had access to newspapers at his girlfriend's

house.  (*Id.*, Ex. 3 at 23–24 [Thomas Dep.].)  Plaintiff stated that most of his personal contacts were in the sheet metal industry, and that he had been unsuccessful in obtaining positions in this industry because his sheet metal worker's license had expired.  (*Id.*, Ex. 3 at 23 [Thomas Dep.].) Plaintiff estimated that it would take several months to renew his license, but stated that he had not pursued the necessary training for re-licensing because he was trying to start his business. (*Id.*)

With respect to his employment qualifications, Plaintiff admitted that he was qualified for a broad range of jobs, including welder, painter, light construction worker, warehouse shipper, maintenance foreman, handyman, truck driver, automobile mechanic, garage door installer, heavy equipment operator, and sheet metal worker.  (*Id.*, SOF ¶ 89; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 89.)  Both parties agree that jobs were available in most of these fields in the Denver area in the year following Plaintiff's separation from Defendant.  (*Id.*, SOF ¶ 90; *admitted at* Pl.'s Resp., RSOF ¶ 90.)  During his deposition, Defendant's counsel reviewed various want ads in the current edition of the Denver Post with Plaintiff, and the latter acknowledged that some of the ads were "interesting," and that others were "worth making a phone call" to investigate.  (*Id.*, SOF ¶¶ 100–01, 103; admitted at Pl.'s Resp., RSOF ¶¶ 100–01, 103.)  Plaintiff admitted in a subsequent interrogatory that he had not followed up on any of these positions.  (*Id.*, SOF ¶ 104; *admitted at* Pl.'s Resp., RSOF ¶ 104.)

Finally, with respect to his unemployment benefits, Plaintiff testified that he reported his required five "job contacts" to the Colorado Unemployment Insurance Agency every week in order to maintain his eligibility for unemployment benefits.  (*Id.*, Ex. 3 at 24 [Thomas Dep.].)

Defendant appended a copy of Plaintiff's handwritten log memorializing such contacts to its brief. (*See id.*, Ex. 17 [Job Contacts Log].) Plaintiff admits that, on one occasion during a snowstorm, he falsely told the state agency that he had made his required five contacts "because [he] was still trying to get the unemployment." (*Id.*, Ex. 3 at 24 [Thomas Dep.].)

## 2. *Procedural History*

On April 24, 2007, Plaintiff filed a complaint in this court alleging that Defendant: (1) violated Section 1981 by firing him in retaliation for his opposition to racial discrimination; and (2) violated Title VII by firing him in retaliation for his opposition to discrimination against members of multiple protected classes. (*See* Compl. ¶¶ 27–45 [filed Apr. 24, 2007].) Plaintiff requested front and back pay in addition to other relief. (*Id.* at 7.)

On January 4, 2008, Defendant filed the instant motion for summary judgment, arguing that Plaintiff: (1) could not prove that he had engaged in good faith opposition to discrimination; and (2) could not prove that he had a reasonable good faith belief that the actions he reported constituted illegal discrimination. (Def.'s Br.) Defendant alternatively moved for partial summary judgment on Plaintiff's demand for front and back pay. (*Id.*) On February 25, 2008, Plaintiff responded to Defendant's motion. (Pl.'s Resp.) On March 13, 2008, Defendant replied. (Def.'s Reply.) This matter is fully briefed and ripe for review.

## ANALYSIS

## 1. *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.     *Evaluation*

Title VII of the Civil Rights Act of 1964 makes it unlawful for "an employer to discriminate against any of his employees . . . because he has opposed any practice made an

unlawful employment practice by" the Act. 42 U.S.C. § 2000e-3(a) (2006). Although Section 1981 contains no comparable statutory language, courts have found a cause of action for retaliation to be implied under that statute. *See, e.g.*, *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1258 (10th Cir. 2001) (noting that section 1981 "support[s] a cause of action for retaliation").

The elements of a retaliation claim under both Title VII and Section 1981 are identical. *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1103 n.1 (10th Cir. 1998). To establish a *prima facie* case of retaliation under either statute, a plaintiff must demonstrate that: (1) he engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the allegedly retaliatory action materially adverse; and (3) that a causal connection existed between the protected activity and the materially adverse action. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework under which, if a plaintiff can establish a *prima facie* case of retaliation, the burden shifts to the defendant to show a legitimate, non-retaliatory reason for the adverse employment action. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006) (citation omitted). Once the defendant meets this burden, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretext. *Id.* (citation omitted).

In the instant case, Defendant essentially concedes for the purposes of this motion that Plaintiff may have suffered an adverse employment action, and that a causal connection may exist between this action and his allegedly protected act. (*See* Def.'s Br. at 3 & n.1, 18 n.5.)

Moreover, Defendant does not even proffer a valid, non-retaliatory reason for such an adverse employment action.[4]  (*See* Def.'s Br.; Def.'s Reply.)  Instead, Defendant draws upon non-binding case law to suggest that Plaintiff cannot prove an *additional* element to his retaliation claims — namely, that his protected activity constituted "good faith" opposition to discrimination.  (Def.'s Br. at 31–37.)  Moreover, Defendant asserts that Plaintiff cannot establish the first element of his *prima facie* case because he did not have a reasonable good faith belief that the actions he opposed constituted illegal discrimination.  (*Id.* at 37–49.)  In the alternative, Defendant maintains that it is entitled to partial summary judgment on Plaintiff's demand for front and back pay because he failed to make reasonable efforts to find alternative employment.  (*Id.* at 49–54.)  I assess each of these arguments in turn.

>    *a.*    ***Plaintiff's "Good Faith" Opposition to Illegal Discrimination***

Defendant first contends that Plaintiff's complaints to Mr. Ruegsegger did not constitute "good faith" opposition to illegal discrimination because these complaints were "an objection to Defendant's allegedly unfair treatment of [Mr.] Filippazzo and a tool to attack [Messrs.] Smith and Brockman for the perceived slights that they inflicted on Plaintiff and, particularly, [Mr.] Filippazzo."  (Def.'s Br. at 32.)  For the following reasons, I find Defendant's argument unpersuasive.

---

[4]This strategy leads Plaintiff to surmise that "by failing to present a single legitimate reason for Plaintiff's termination, arguably this is a case in which a *Plaintiff's* summary judgment is warranted."  (Pl.'s Resp. at 19 [emphasis in original].)  Nonetheless, because Plaintiff has failed to properly move for such judgment, I need not consider this argument further.  *See* D.C.COLO.LCivR 7.1(c) (2008) (stating that "a motion shall not be included in a response or reply to the original motion").

Defendant's suggestion that Plaintiff must prove "good faith" opposition to discrimination — and, correlatively, that "complaints . . . made for a reason *other* than opposing discrimination . . . are not protected and cannot support a retaliation claim" — purports to derive from three non-binding cases from other circuits. (*See* Def.'s Br. at 31 & n.9 [emphasis added].) Upon review, I find that only two of these cases even arguably stand for such propositions.[5] In *Montiero v. Poole Silver Co.*, 615 F.2d 4 (1st Cir. 1980), the First Circuit, in affirming the judgment of a district court entered after a bench trial, arguably articulated a rule that a plaintiff may not prevail on a Title VII retaliation claim where the alleged discrimination he was opposing was raised "as a smokescreen in challenge to [a supervisor's] legitimate criticism." 615 F.2d at 8. At least one district court has read *Montiero* as so holding, granting a defendant's motion for summary judgment where the evidence suggested that the plaintiff "did not protest [a supervisor's] misconduct in good faith," but instead raised such misconduct "only after being reprimanded for misconduct of his own." *Fowler v. District of Columbia*, 404 F. Supp. 2d 206, 210 (D.D.C. 2005). No other court appears to have read *Montiero* as establishing this same rule of law, and Defendant has pointed to no additional law from *any* jurisdiction suggesting that a plaintiff must oppose discrimination out of any particular motive. *Cf. Burch v. Henderson*, No. 97–1095–CV–W–6, 2000 WL 97184, at *10 (W.D. Miss, Jan. 27, 2000) (noting that 42 U.S.C. § 2000e-3[a] contains no requirement as to "the underlying reason or motive for the opposition,"

_____

[5]The third case addresses whether a plaintiff had a reasonable good faith belief that the behavior he was opposing *constituted* illegal discrimination, not whether he was *opposing* such discrimination in good faith. *See Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir. 1997).

and declining to graft a "purity of motive" requirement onto the statutory language).  By contrast, multiple courts — including the Tenth Circuit — have read *Montiero* as holding simply that plaintiffs must harbor a good faith belief that the behavior they are opposing constituted illegal discrimination.  *See Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984); *see also Hanlon v. Chambers*, 464 S.E.2d 741, 753 (W. Va. 1995).

In the absence of any explanatory discussion from Defendant as to why its seemingly aberrant reading of these two outlier cases should be adopted, I decline to follow them as the statutory language of Title VII provides no indication that a plaintiff must oppose discrimination out of any particular motive.  *See* 42 U.S.C. § 2000e-3(a) (2006) (making it unlawful for an employer to retaliate against an employee "because he has opposed" discrimination).  Moreover, even if I had followed the rules Defendant purports to read in these cases, summary judgment would still be inappropriate for the following two reasons.

First, despite its burden of proving entitlement to judgment as a matter of law, Defendant has cited *no* law suggesting that opposition to illegal discrimination which is premised upon the desire to help a co-worker by showing a disparity between that co-worker's treatment and the treatment of other alleged offenders is inconsistent with "good faith" opposition to such discrimination.  (*See* Def.'s Br. at 31–37.)  Because I see no inherent contradiction between the desire to help a friend and the desire to forthrightly oppose discrimination, I find Defendant's implicit suggestion that the former motive precludes the latter as a matter of law to present a false dichotomy.  (*See, e.g.*, *id.* at 35 [arguing that "Plaintiff was not engaging in . . . protesting illegal discrimination . . . (because) he was opposing the supposedly unfair . . . treatment of his

friend"].)  Moreover, I note that, even if I assumed any ulterior motive Plaintiff may have

harbored in reporting the alleged discrimination would undermine his credibility in reporting the

same, such an assumption would merely highlight the rationale for denying Defendant's motion

for summary judgment.  *See, e.g.*, *Burch*, 2000 WL 97184, at *10 (rejecting similar argument

that delay between alleged discriminatory actions and a plaintiff's report of the same mandates

summary judgment because, while "[t]he passage of time might weaken the inference that an

employee has opposed an unlawful employment practice, . . . it does not by itself defeat such an

inference as a matter of law").

Second, as a factual matter, I find that Plaintiff has proffered sufficient evidence to

demonstrate a triable issue of fact on his actual motivation in speaking with Mr. Ruegsegger.

Specifically, Defendant has proffered deposition testimony that he had felt "appalled" by

Defendant's investigation of Mr. Filippazzo because he felt that Defendant's legal department

"needed to look into other things that were going on in the company."  (*See* Def.'s Br., Ex. 4 at 5

[Thomas Dep.], Ex. 3 at 19 [Thomas Dep.].)  Moreover, both Plaintiff and Mr. Filippazzo

testified that they intended to point out what they perceived to be unfair application of

Defendant's policies — *including its antidiscrimination policy* — in their meeting with Mr.

Ruegsegger.  (*Id.*, SOF ¶ 72; *admitted at* Pl.'s Resp., RSOF ¶ 72.)  I find that a reasonable jury

could conclude from such evidence that Plaintiff intended to forthrightly oppose discrimination

in his meeting with Mr. Ruegsegger, whatever *additional* motivation he might *also* have had.[6]

_____

[6]Defendant contends that such evidence is meaningless because other evidence "make[s]
it crystal clear that Plaintiff was protesting that his friend [Mr.] Filippazzo had allegedly been

*Cf. Montiero*, 615 F.2d at 8–9 (affirming district court's determination regarding the plaintiff's motive in opposing discrimination only *after* the presentation of evidence, and in part because no transcript of the bench trial existed, thus making such findings "virtually beyond review").

Finally, Defendant makes one additional argument — curiously interwoven into its argument pertaining to "good faith" opposition — that needs to be addressed. Defendant points to a line of cases stating that complaints which lack any indication that the conduct complained of was motivated by race or another protected trait do not constitute protected activity in opposition to discrimination. (*See* Def.'s Br. at 35–36 & n.15.) For instance, in *Anderson v. Academy School District 20*, 122 F. App'x 912 (10th Cir. 2004), the Tenth Circuit held that a complaint which recounted a "lengthy history of misconduct by [a plaintiff's] supervisor without even alleging racial bias" was not protected activity. 122 F. App'x at 916. Similarly, in *Petersen v. Utah Department of Corrections*, 301 F.3d 1182 (10th Cir. 2002), the Tenth Circuit held that "the absence of [a reference to unlawful discrimination] can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." 301 F.3d at 1188. Defendant concludes from such cases that Plaintiff's retaliation claims are barred because he was only complaining about the unfair — but not discriminatory — treatment of Mr. Filippazzo, and not about illegal

---

treated unfairly relative to [Messrs.] Smith and Brockman and not any form of illegal discrimination." (Def.'s Reply at 5.) I remain unconvinced. This argument is persuasive only to the extent that it correctly presupposes the incompatibility of protesting unfair treatment with protesting illegal discrimination, and I find that a reasonable jury could conclude that Plaintiff was protesting Mr. Filippazzo's alleged unfair treatment *by* protesting alleged illegal discrimination.

discrimination.[7]  (*See* Def.'s Br. at 35–36.)  I am unconvinced.  Despite Defendant's clever framing of the June 24, 2006, meeting as a simple complaint about Mr. Filippazzo's alleged unfair treatment, I find that a reasonable jury could conclude that Plaintiff and Mr. Filippazzo were protesting *both* Mr. Filippazzo's alleged unfair treatment *and* Messrs. Smith and Brockman's alleged illegal discrimination.  Moreover, I note that Defendant's attempt to recast this case as one in which Plaintiff failed to allege *any* illegal discrimination is frankly absurd in light of the extensive allegations of sexual, racial, religious, and other discrimination he and Mr. Filippazzo purportedly reported to Mr. Ruegsegger during their meeting.  (*See generally* Facts, §1[c], *supra*.)

For the foregoing reasons, I decline to grant Defendant's summary judgment motion on the grounds that either Plaintiff lacked "good faith" opposition to illegal discrimination, or that he failed to indicate that the conduct he opposed was motivated by race or another protected trait.

### b.    *Plaintiff's Reasonable Good Faith Belief That the Actions He Opposed Constituted Illegal Discrimination*

To establish the first element of his *prima facie* case — protected opposition to discrimination — Plaintiff need not prove the illegality of the allegedly discriminatory acts he

---

[7]Moreover, in an utterly audacious attempt to explain away the myriad allegations of sexual, racial, religious, and other discrimination Plaintiff reportedly raised in his conversation with Mr. Ruegsegger, Defendant simply contends that "the mere fact that Plaintiff and [Mr.] Filippazzo framed their complaint about the Filippazzo investigation by reference to allegedly discriminatory conduct is immaterial because that conduct was not the substance of their complaint."  (Def.'s Br. at 36.)

opposed; instead, "he need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory." *Hertz v. Luzenac Amer., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004) (citation omitted). The requirement of a "reasonable good faith" belief in discrimination contains both objective and a subjective elements; "the employee must not only show that he subjectively believed that the challenged actions were discriminatory, but he must also show that that belief was objectively reasonable." *Gruppo v. FedEx Freight Sys., Inc.*, No. 05–cv–02370–MSK–MEH, 2007 WL 1964080, at *3 (D. Colo. June 29, 2007) (citation omitted). In assessing whether a belief is objectively reasonable, courts may consider the substantive law of employment discrimination. *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271–72 (2001) (outlining substantive law of sexual harassment discrimination in concluding that no reasonable employee could believe that a single comment was discriminatory); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264–65 (10th Cir. 2001) (considering case law holding that ailments such as sinusitis may constitute disabilities in assessing objective reasonableness of a plaintiff's belief that her request for accommodation of the same was protected under the ADA).

In the instant case, Defendant argues that Plaintiff could not have had a reasonable good faith belief that the various behaviors he described to Mr. Ruegsegger constituted illegal discrimination. (Def.'s Br. at 37–49.) To demonstrate my disagreement with this contention, I need merely address Defendant's argument as it pertains to Defendant's arguably most egregious acts of discrimination: religious and racial discrimination.

### i. *Religious Discrimination*

In his deposition, Plaintiff testified that he believed Mr. Brockman's promotion had been related to his attendance at Mr. Smith's church. (*See* Def.'s Br., Ex. 4 at 9 [Thomas Dep.].) To establish a *prima facie* case of disparate treatment religious discrimination, a plaintiff must show: "(1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs." *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1039 (10th Cir. 1993). Failure to promote can constitute an adverse employment action. *See Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). In light of this case law, I find — for the following reasons — that a reasonable jury could conclude that Plaintiff's *de facto* allegation of disparate treatment religious discrimination was objectively reasonable.

Plaintiff claimed that Mr. Brockman, who began attending Mr. Smith's church, was promoted by Mr. Smith to manage Defendant's distribution center. (Def.'s Br., SOF ¶¶ 8, 79[b]; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 8, 79[b].) By contrast, Plaintiff testified that Mr. Smith told him that he would have to quit his maintenance position, apply for a position in a retail store, and advance through that channel in order to be promoted. (Pl.'s Resp., Ex. 1 at 15 [Thomas Dep.].) Plaintiff also believed that Mr. Brockman was less experienced than him, was unintelligent, used inappropriately informal language, and was not promoted "simply because of his knowledge or his skill." (*Id.*, SOF ¶ 28; *admitted at* Pl.'s Resp., RSOF ¶ 28; *see also id.*, Ex. 4 at 9 [Thomas Dep.].) By contrast, Plaintiff testified to having been told that Defendant's

owner thought highly of Plaintiff.  (Pl.'s Resp., SAF ¶ 7; *admitted in relevant part at* Def.'s

Reply, RSAF ¶ 7.)  Finally, Plaintiff testified that Mr. Smith talked to Plaintiff about his church

"numerous times," encouraged him to attend on at least several occasions, and told Plaintiff that

"there's a place in the Bible for people like you who don't believe."  (Def.'s Br., Ex. 4 at 8–9

[Thomas Dep.].)

Based on such evidence, I find that a reasonable jury could conclude that Plaintiff's *de*

*facto* allegation of disparate treatment religious discrimination was objectively reasonable

because proof of such discrimination requires only that an employee suffer an adverse

employment action, that the employee be performing satisfactorily prior to that action, and some

additional evidence to support the inference that the employee's failure to follow his employer's

religious beliefs caused the adverse employment action.  *See Shapolia*, 992 F.2d at 1033*; see*

*also Samoza v. Univ. of Denver*, 513 F.3d 1206, 1214–15 (10th Cir. 2008) (finding a meeting in

which plaintiffs "made clear their concerns about the environment of the workplace and their

perceived disparate treatment" was sufficient to satisfy the protected activity prong of a *prima*

*facie* case of retaliation).

In counseling against the above conclusion, Defendant essentially argues that Plaintiff

could not have had a good faith subjective belief that Mr. Brockman's promotion was

discriminatory because Plaintiff: (1) "admitted that he did not have complete knowledge of [Mr.]

Brockman's qualifications;" (2) allegedly testified to his belief that Mr. Brockman had been

promoted due to his friendship with Mr. Smith, not his religious beliefs; and (3) did not complain

about alleged religious favoritism at the time of the promotion.  (Def.'s Br. at 47.)  I am not

persuaded. First, Plaintiff has pointed to no law suggesting that a plaintiff may only have a good faith subjective belief that discrimination occurred if he has investigated and is aware of all the pertinent facts, and I find such a proposition absurd.[8] *See Dick v. Phone Directories Co.*, Inc., 397 F.3d 1256, 1267 (10th Cir. 2005) (finding that plaintiff may maintain an action for retaliation even if "the conduct forming the basis of her underlying complaint was not adjudged to have violated Title VII"). Second, I find Plaintiff's alleged testimony that he believed Mr. Brockman to have been promoted due to his friendship with Mr. Smith and not his religious beliefs to be highly ambiguous at best,[9] and certainly insufficient to establish his subjective belief as a matter of law. Third, I find any delay between Mr. Brockman's promotion and Plaintiff's report of alleged religious discrimination insufficient to disprove Plaintiff's subjective belief that the promotion was discriminatory in the light of his claim that he failed to report discrimination earlier for fear of retaliation. (*See* Pl.'s Resp., Ex. 2 at 13–14 [Thomas Dep.]); *see also*, *Burch*, 2000 WL 97184, at *10 (noting that delay in reporting discrimination "does not by itself defeat [the inference that an employee has opposed discrimination] as a matter of law").

---

[8]Defendant does cite case law suggesting that "a reasonable good-faith belief that discrimination has been occurring requires a meaningful factual basis." (*See* Def.'s Br. at 46 [citing *Arzate v. City of Topeka*, 884 F. Supp. 1494, 1504 (D. Kan. 1995)].) I find this standard more than satisfied by the above-cited evidence.

[9]In response to a question as to why he believed Mr. Brockman's promotion had been religiously motivated, Plaintiff replied, in part: "I believe [Mr. Brockman] became too close friends [sic] with [Mr. Smith]. I mean, they become [sic] gun buddies, hunting buddies, church buddies prior to him being promoted." (Def.'s Br., Ex. 4 at 9 [Thomas Dep.].)

Based on the foregoing, I find that a reasonable jury could conclude that Plaintiff had a reasonable good faith belief that Mr. Smith engaged in disparate treatment religious discrimination when he spoke with Mr. Ruegsegger.

### ii.    *Racial Discrimination*

In his EEOC charge of discrimination, Plaintiff claimed that Defendant's (1) use of its Hispanic workers "to do all the odd jobs around the building such as weeding and trash removal," and (2) paying of its Hispanic employees "a lower salary than similarly situated white employees," constituted "racial discrimination."  (*See* Def.'s Br., Ex. 10 at 2 [EEOC Charge].) To establish a *prima facie* case of disparate treatment racial discrimination under Title VII, a plaintiff must show that: (1) he is a member of a racial minority; (2) he suffered an adverse employment action; and (3) similarly situated employees were treated differently.  *Trujilo v. Univ. of Colo. Health Sciences Ctr.*, 158 F.3d 1211, 1215 (10th Cir. 1998).  In light of this case law, I find — for the following reasons — that a reasonable jury could conclude that both of Plaintiff's allegations of racial discrimination were objectively reasonable.

### (a)    *Use of Hispanic Employees for Unskilled Labor*

With respect to Defendant's alleged use of its Hispanic employees for unskilled labor, Plaintiff testified that Mr. Smith once told Mr. Filippazzo to "get his Mexicans to go out and clean up the lot, pick up trash, mow, [and] do things like that."  (Def.'s Br., Ex. 4 at 15 [Thomas Dep.].)  Plaintiff further testified to having been told by one of Mr. Filippazzo's Hispanic employees that such workers "had to go clean up after the white guy [sic], that [Mr. Smith] wouldn't make the white guy do it, even though he had warehouse employees over there that

were low pay in scale, too."[10]  (*Id.*, Ex. 4 at 17 [Thomas Dep.].)  Plaintiff testified that there were

"very few" Hispanic employees in Defendant's warehouse.  (*Id.*)

Based on such evidence, I find a reasonable jury could conclude that Plaintiff's belief

that Mr. Smith had engaged in racial discrimination was objectively reasonable because proof of

disparate treatment racial discrimination requires only that a plaintiff be a member of a racial

minority; that he suffer an adverse employment action; and that similarly situated employees be

treated differently.  *Trujilo*, 158 F.3d at 1215; *see also Bergersen v. Shelter Mut. Ins. Co.*, 229 F.

App'x 750, 752, 754 (10th Cir. 2007) (finding a plaintiff's report to management of his

insurance company employer that he believed "the company was discriminating against its

Hispanic insureds" to constitute protected opposition to discrimination.)

In counseling against the above conclusion, Defendant essentially argues that Plaintiff

could not have had a subjective good faith belief that Mr. Smith's actions constituted illegal

discrimination because Plaintiff: (1) admitted that there is nothing wrong with an employer's

decision to use workers who are paid the least to do unskilled labor; and (2) allegedly admitted

that "he had no reason to believe that [the Hispanic employees] were used for clean up work

---

[10]Defendant objects to this evidence on hearsay grounds, and concludes from its objection "that it remains undisputed that ***Plaintiff*** did not have a belief, let alone a good faith belief, that Defendant's Hispanic chair factory workers were being discriminated against because they were asked to pick up trash."  (*See* Def.'s Reply at 8–9 [emphasis in original].)  I disagree.  While the hearsay rule would certainly bar Plaintiff from proffering such evidence to prove that such discrimination occurred, it would *not* bar Plaintiff from proffering such evidence to suggest his *belief* that such discrimination occurred.  *See* Fed. R. Evid. 801(c) (2008) (defining hearsay as an out-of-court statement "offered in evidence to prove the truth of the matter asserted"); *see also United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay.").

because of their race rather than pay rate." (Def.'s Br. at 48.) I am not persuaded. First, Plaintiff's abstract admission regarding the propriety of using low-paid labor for unskilled work is insufficient to disprove his good faith belief that Defendant engaged in discrimination in light of his *additional* testimony that he had been told by an Hispanic employee that Mr. Smith did not make his warehouse employees to do the same sort of work, even thought they were "low pay in scale, too." (*See id.*, Ex. 4 at 17 [Thomas Dep.].) Moreover, Plaintiff's alleged admission that he had "no reason to believe [Hispanic] workers were used for clean up work because of their race rather than pay rate" is unsupported by the evidence. (*Id.* at 48.) The exchange Defendant cites for this alleged admission actually unfolded as follows:

> Q.    Do you have any reason to believe that the reason those folks in [Mr. Filippazzo's] chair factory were used for menial cleanup tasks was other than because they were the cheapest employees over there?
> A.    There again, I don't know that they were the cheapest, sir, but . . .
> Q.    The answer to my question is no; is that right?
> A.    The answer to your question is I don't know.

(*Id.*, Ex. 4 at 20 [Thomas Dep.].) Such evidence does *not* support Defendant's contention that Plaintiff *admitted* "he had no reason to believe that [the Hispanic employees] were used for clean up work because of their race rather than pay rate," and it does not *disprove* his alleged good faith belief that such discrimination occurred. (*Id.*) Accordingly, for the foregoing reasons, I find that a reasonable jury could conclude that Plaintiff had a good faith reasonable belief that Defendant engaged in disparate treatment racial discrimination when he spoke with Mr. Ruegsegger.

### *(b)    Pay Differential Between Hispanic and White Workers*

With respect to the alleged pay differential between Hispanic and white workers performing the same work, Plaintiff claimed that Hispanic workers had been assigned to unload trucks, but had been paid their usual wage as chair factory workers, and not the higher wage paid to employees specifically tasked to such labor.  (*Id.*, SOF ¶ 79[j][i]; *admitted at* Pl.'s Resp., RSOF ¶ 79[j][i].)

Based on such evidence, I find that Plaintiff's belief that Mr. Smith had engaged in racial discrimination was objectively reasonable because proof of disparate treatment racial discrimination requires only the elements outlined *supra*.  *See Trujilo*, 158 F.3d at 1215.

In arguing against this conclusion, Defendant again effectively challenges Plaintiff's subjective good faith belief by: (1) making a broad hearsay objection to the source of Plaintiff's knowledge regarding this alleged pay differential; (2) arguing that Plaintiff admitted that "[Mr.] Smith put a stop to this practice after learning about it and before [Plaintiff's] meeting with [Mr. Ruegsegger];" and (3) pointing to *Mr. Filippazzo's* testimony that the Hispanic workers in question had subsequently been given "amazing" raises.  (Def.'s Br. at 48.)  I find such arguments unavailing.  First, Defendant's broad hearsay objection is ineffective for the reasons outlined above.  (*See* Analysis, § 2bii[a] n.10, *supra*.)  Second, Defendant has cited no law suggesting that the cessation of an alleged act of discrimination nullifies a good faith belief that the act was discriminatory, and I find no reason to *sua sponte* so hold.  Third, I find Mr. Filippazzo's testimony regarding subsequent pay raises irrelevant to *Plaintiff's* subjective belief as to the discriminatory nature of Defendant's practice, or to the objective reasonableness of this belief as viewed through the prism of case law.  Accordingly, for the foregoing reasons, I find

that a reasonable jury could conclude that Plaintiff had a reasonable good faith reasonable belief that Defendant engaged in disparate treatment racial discrimination when he spoke with Mr. Ruegsegger.

Based on the foregoing, I decline to grant Defendant's motion for summary judgment on the grounds that Plaintiff could not have had a reasonable good faith belief that the behavior he opposed constituted illegal discrimination.

### c. Plaintiff's Failure to Make Reasonable Efforts to Find Alternative Employment

Lastly, Defendant argues that it is at least entitled to partial summary judgment on Plaintiff's claim for front and back pay because Plaintiff failed to make reasonable efforts to find alternative employment. (Def.'s Br. at 49–54.) Although it is a close question, I find for the following reasons that partial summary judgment is inappropriate.

An employee who requests back pay and benefits in an employment discrimination suit is "required to make reasonable efforts to mitigate damages." *Aguinaga v. United Food & Commercial Workers*, 993 F.2d 1463, 1474 (10th Cir. 1993) (citation omitted). Such an employee "need only make a reasonable and good faith effort, and is not held to the highest standards of diligence." *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1158 (10th Cir. 1990). Moreover, the employer bears the burden of establishing that the employee did not exercise reasonable diligence in attempting to mitigate his damages. *Id.*

In the instant case, Plaintiff testified that he used internet sites such as Craigslist.org to search for jobs, looked in newspaper want ads, and contacted employers about jobs listed in those ads. (Def.'s Br., Ex. 3 at 23–24 [Thomas Dep.].) Moreover, Plaintiff testified that he

reported his required five "job contacts" to the Colorado Unemployment Insurance Agency on a weekly basis in order to maintain his eligibility for unemployment benefits, and his handwritten job contacts log arguably buttresses this contention. (*Id.*, Ex. 3 at 24 [Thomas Dep.], Ex. 17 [Job Contacts Log].) Finally, Plaintiff testified that, as of the date of his deposition, he was "[j]ust starting to see some money coming back from the business" he was trying to start. (*Id.*, Ex. 3 at 20–21, 24–25 [Thomas Dep.].) Viewed in the light most favorable to Plaintiff, I find that this evidence could lead a reasonable jury to conclude that Plaintiff made a "reasonable and good faith effort" to mitigate damages by seeking alternative employment. *See Spulak*, 894 F.2d at 1158 (noting that a plaintiff's "efforts to find work by submitting applications and resumes . . . constitutes sufficient evidence of reasonable efforts at mitigation to send the issue to the jury").

In arguing against this conclusion, Defendant asserts that Plaintiff's (1) pursuit of an "obviously unsuccessful" business, (2) alleged attempts to gain employment in the sheet metal industry even though he was unlicensed, and (3) arguably lackadaisical job search efforts, demonstrate that his mitigation efforts were *unreasonable* as a matter of law. (Def.'s Br. at 49–54.) I am not persuaded. First, I find Plaintiff's testimony that he was "[j]ust starting to see some money coming back from the business" sufficient to raise a triable issue of fact as to the reasonableness of his self-employment efforts notwithstanding the less than $1,000 in sales he generated from December 2006 to August 2007.[11] (*Id.*, Ex. 3 at 20–21, 24–25 [Thomas Dep.];

---

[11]Moreover, I find Defendant's proffered cases suggesting that Plaintiff's business efforts were "unreasonable" to be distinguishable from the case at bar as all of these cases assessed the sufficiency of evidence following trial, and none of these cases addressed mitigation efforts predicated upon *both* starting a new business *and* simultaneously conducting a job search. *See*

*see also id.*, SOF ¶ 94; *admitted at* Pl.'s Resp., RSOF ¶ 94.)  Second, I find Defendant's

contention that Plaintiff *only* applied for jobs in the sheet metal industry to be unproven as

Plaintiff testified that most of his *personal contacts* were in this industry, and because Defendant

has made no effort to demonstrate the nature of the positions listed in Plaintiff's "job contacts"

log, despite bearing the burden of proof on mitigation.  (Def.'s Br., Ex. 3 at 23 [Thomas Dep.]);

*see also Spulak*, 894 F.2d at 1158 (the employer bears the burden of proving that the employee

did not exercise reasonable diligence).  Third, Defendant's complaints that Plaintiff failed to: (1)

use Monster.com, (2) use a temporary agency, (3) consistently spend more than an hour a day on

his job search, or (3) follow up on the job leads that *Defendant's counsel* provided to him during

his deposition, are insufficient to prove that his efforts were unreasonable as a matter of law.  (*Id.*

at 52–54.)  Moreover, I agree with Plaintiff that he "is merely required to make a reasonable

effort to mitigate his damages — not to follow *Defendant's* advice as to precisely what means of

mitigation *Defendant* thinks Plaintiff should follow."  (Pl.'s Resp. at 29.)

Accordingly, for the foregoing reasons, I decline to grant Defendant partial summary

judgment on Plaintiff's claim for front and back pay.

### 3.    *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.      DEFENDANT's motion for summary judgment (#27) is DENIED.

---

*Hansard v. Pepsi-Cola Metro. Bottling Co., Inc.*, 865 F.2d 1461, 1468 (5th Cir. 1989); *Manning v. McGraw-Hill, Inc.*, 64 F. Supp. 2d. 996, 999–1002 (D. Colo. 1998); *Johnson v. Memphis Police Dep't*, 713 F. Supp. 244, 249 (W.D. Tenn. 1989).

The court will hold a Final Pretrial Conference commencing at 3:45 o'clock p.m. on May 23, 2008 in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord.wpd  These specific web addresses should be used to insure that the proper format is observed.

Dated this 30th day of April 2008.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge